**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

_____
                                          )
COLLEEN PATTERSON,                        )
                                          )
        Plaintiff,                        )
                                          )        C.A. No.
v.                                        )
                                          )
OPTIMUM LABS, INC.,                       )
WILLIAM OWENS, JR, individually and as    )
owner and employee, HEATHER CABRAL,       )
and ROBERT JOHNSON, individually and      )
as a _de facto_ owner and employee,       )
                                          )
        Defendants.                       )
_____   )

**COMPLAINT**
**AND DEMAND FOR TRIAL BY JURY**

**Introduction**

1)      Colleen Patterson worked at Optimum Labs, Inc. as a case manager.  During her

employment, William Owens, Jr. the CEO and a Director of the corporation, along with Robert

Johnson, an executive employee and alleged _de facto_ owner of Optimum Labs, subjected her to

numerous instances of sexual harassment and disparate treatment which were compounded by

plaintiff's direct supervisor Heather Cabral's spreading of false information about the plaintiff

and failing to stop the harassment of the plaintiff. To remedy the damage caused by the

Defendants, the Plaintiff brings the following claims: 1) quid pro quo sexual harassment under

Title VII; 2) hostile work environment sexual harassment under Title VII; 3) gender based

discrimination under Title VII; 4) sexual harassment and quid pro quo sexual harassment under

Chapter 151B; ) hostile work environment sexual harassment under Mass. G.L. c. 151B; 6)

gender based discrimination in violation of Mass. G.L. c. 151B §§ 4(1); 151B § 1(18); 7) aiding and abetting harassment and discrimination in violation of Mass. G.L. c. 151B § 4 and 8) retaliation in violation of Mass. G.L. c. 151B § 4.

## Parties

2)   The Plaintiff, Colleen Patterson ("Teixeira"), is a Massachusetts citizen residing in Bristol County.

3)   Optimum Labs, Inc. ("Optimum Labs") is a business with its principal place of business and corporate address at 413 County Street, New Bedford, MA 02740.  Optimum Labs is a for profit business that provides toxicology lab testing services.

4)   William Owens, Jr. ("Owens') is a Massachusetts citizen residing in this District. Owens is an owner of Optimum Labs and is listed on its corporate filings as a Director of the company.

5)   Robert Johnson ("Johnson") is a Massachusetts citizen residing in this District**.** Johnson is a *de facto* owner of Optimum Labs.

6)   Heather Cabral ("Cabral") is a Massachusetts citizen residing in this District.  Cabral was employed by Optimum as its Case Manager Supervisor.

## Jurisdiction

7)    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the Plaintiff brings numerous federal claims arising from Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq*.  This Court has personal jurisdiction over the defendants because all are Massachusetts citizens.

8)   Venue is proper because all defendants reside in the Eastern District of Massachusetts.

## Factual Allegations Common to All Counts

9)    On or about March of 2014 Patterson was hired as a Case Manager by Optimum Labs.

10)   During her employment at Optimum Labs, Johnson, who is listed as the Chief Operating

Officer on the firm's website, ran the day to day activities of Optimum Labs and held himself out

as the owner of Optimum Labs.  At all relevant times, Johnson made executive decisions for the

company and held himself out as an executive.

11)   Defendant Owens held himself a manager of Optimum and held the title of Chief Executive

Officer according to the firm's website.  Owens is also listed as a Director of the corporation in

corporate filings.

12)   Johnson told the employees that Optimum was his business and that he could do whatever

he wanted.  With regard to the business, Johnson at one point stated words to the affect that the

business was his and he could burn the building down if he wanted to.

13)   In addition, Johnson sometimes paid employees with cash.  Moreover, complaints about

Johnson and Owens to others in management were not investigated, nor did they result in any

discipline of Johnson or Owens.  They both held themselves out to the employees as owners of

Optimum and indicated that they made final decisions for Optimum.

14)   At all relevant times, defendant Heather Cabral was the Case Manager Supervisor who

directly supervised the plaintiff.

**Sexual Harassment and Hostile Work Environment**

15)   Johnson regularly made sexually charged and sex based comments to the plaintiff and her

co-workers, including the following:

   a.   Johnson would comment on Teixeira's figure;

   b.   Johnson would comment on the physical features of female employees and told

   one woman who had large breasts words to the effect that she had to "put her breasts

away because she might hurt somebody" and added "you too Juanita,"  referring to the

plaintiff;

c.      Johnson commented on the clothes female employees wore; one on occasion, with

regard to a female employee wearing tight pants, he commented, "Damn, her lips are

talking to me."

d.      He kissed a female co-worker on the forehead causing her to be uncomfortable

and nervous around him;

e.      Johnson commented on a female employee's personal relationships by stating that

she had sex with multiple men;

f.      With regard to another female co-worker who had been out partying, he indicated

that "You know, you are out there working that (body);"

g.      Johnson had an affair with a young female employee from New Jersey, demoted

an employee in New Bedford, promoted the female employee he was having an affair

with, moved her to the New Bedford office and continued to engage in a personal

relationship with her which was known to staff;

h.      Johnson repeatedly spoke down to and berated the female employees; if they

spoke back it sometimes resulted in being sent home without pay;

i.      On one occasion, Johnson verbally berated a female co-worker for talking back to

him, rushed to her work area, menacingly stood over her with her arms extended as she

sat at her desk saying words to the effect, "Go ahead, go ahead, say one more thing";

j.      Johnson repeatedly surveilled me and other female employees with on-site and

off-site video cameras, which were not disclosed to female employees, in work areas

and in the lunchroom;

k.      Johnson referred to sex when attempting to explain work practices; in particular, when seeking implementation of new work practices, Johnson would make the inappropriate analogy to the female employees that he did not want to hear about the last guy they slept with or how they were used to the old boyfriend's ways.

l.      Johnson berated Teixeira and poured trash on her desk in front of female co-workers.

**Different Treatment of Female Employees**

16)   As part of the hostile work environment and the disparate treatment of women at Optimum Labs, Johnson, while off site, would watch the female employees working in the office on video feeds and tell the female employees to stop talking and get back to work.  Johnson did not reprimand the male employees in this manner.

17)   In addition, Johnson assigned female employees to clean the bathrooms, the kitchen and vacuum the office.  The "chore list" was mandatory for female employees, but not for male employees.  Female employees were required to complete their chores before leaving.

18)   At one point Johnson called a meeting to discuss the fact that the chore list was not being completed.  In that meeting, Johnson emptied a barrel of trash on Teixeira's desk to make the point that chores needed to be done.  The trash, which included partially filled coffee cups, rolled off the Teixeira's desk and onto her lap, clothes and personal possessions humiliating her in front of her co-workers bringing her to tears.

19)   Moreover, Johnson talked down to, yelled at and chastised female employees, including the plaintiff, in front of staff but did not do this to male employees.

**Treatment by Defendant Owens**

20)     The defendant Owens engaged in a continuous effort to coerce the plaintiff into a personal, romantic relationship with him through sexual advances and romantic comments which were not welcome by the plaintiff and which she repeatedly ignored.

21)     The plaintiff is 36years old.  Owens is approximately 48 years old, at least ten years older than the plaintiff.

22)     Owens repeatedly asked the plaintiff to come to his home, to use his pool and take Ambien.  He texted her with inappropriate personal content when she was trying to communicate about work.

23)     Owens referred to the plaintiff as "his future."  Owens repeatedly called the plaintiff into his office for no business purpose and stated that he just wanted to see the plaintiff's "pretty face."  He called the plaintiff pet names, like "Sunshine," and referred to the plaintiff's children as his stepchildren.  In addition, Owens questioned the plaintiff about her romantic status.

24)     Owens also asked the plaintiff to go on vacation with him, to go on a buying spree to Victoria's Secrets and called the plaintiff at home at all hours.

25)     At the 2015 company Christmas party Owens stated in front of co-workers that the plaintiff needed to date a man like him who owns his own business.

26)     Because Owens repeatedly called the plaintiff into his office, plaintiff's supervisor and co-workers began to circulate rumors that the plaintiff was having a sexual relationship with Owens.  She was also criticized by managers for taking time to meet with Owens, despite the fact that Owens, the company CEO, had the requests for her to meet with him.

27)     In addition, the plaintiff has repeatedly complained to Owens about false rumors of a relationship between them.  Owens failed to address these false rumors and allowed them to perpetuate in the workplace.

28)     At one point in 2015, the plaintiff had complained to her supervisor, defendant Heather

Cabral, about Owens' inappropriate behavior towards the plaintiff.  Cabral took no action against

Owens, nor was she contacted by human resources regarding her complaint.  Cabral also failed

to put the plaintiff's complaint in writing so it could be investigated by human resources.

29)     After the plaintiff complained to Cabral, Cabral became increasingly hostile towards her

and hypercritical of her job performance.  Cabral took no action on the plaintiff's complaint,

took the position that the plaintiff was, in fact, in a relationship with Owens and directly

criticized the plaintiff by stating to her that she was in his office too much and on the road to

much and that it was "questionable."

30)     After the plaintiff complained to Cabral, her work was hyper scrutinized by Optimum.

On or about February 24, 2016, the plaintiff requested FMLA paperwork as she needed time off

due to an illness. While her doctor was processing the paperwork, she was suspended.

31)     When the plaintiff returned to work on March 1, 2016, she was called into a meeting with

Owens, Cabral, Johnson, Joe Oliveira and Demaris Ferrer.  She was falsely accused of a number

of violations of procedure and was suspended.

32)     The plaintiff informed the defendants that their claims were false, that she was following

a client's instructions regarding certain paperwork and that Optimum should contact the client

for clarification.  Optimum never contacted the client to the plaintiff's knowledge.

33)     On March 8, 2016, after being suspended, Owens called the plaintiff asking to meet with

her.  The plaintiff asked what time she had to come to the office.  Owens responded that he

needed to meet her away from the office and designated the bottom of the plaintiff's block in

New Bedford.

34)      The plaintiff met with Owens.  Owens informed her that she was fired and stated that it

was in part retaliation by Heather Cabral.  He then stated words to the affect: "Heather was being

malicious.  Heather believes whatever she believes about out relationship.  Maybe she wants

some Billy O."  The plaintiff reminded Owens of her repeated complaints to him about false

rumors of a relationship between them.

35)      Owens then stated words to the affect: "You know, if you were fucking the boss you

wouldn't have to worry about losing your job because I would have to keep you by my side

because I run shit."  The plaintiff replied that she could not believe that Owens had just said that.

Owens laughed then asked the plaintiff if she needed anything, to which she replied "No."

Owens then suggested to the plaintiff that now that she had lost her job, he could re-hire her to

go on the road with him.

36)      After the meeting, Owens called her later that day to ask "Are you OK?" The plaintiff

asked if anyone had called the client.  Owens asked if the plaintiff was going to be able to make

it with three kids, if she needed money and to call him if she needed anything.

37)      Owens then sent the plaintiff text messages that said: "What's Up? "missing u" and "you

were supposed to be with me."  Owens called the plaintiff again. She again asked if anyone had

contacted the client and Owens indicated "No."

38)   The plaintiff filed her MCAD charge *pro se* on March 31, 2016. She has also received a

right to sue letter from the EEOC dated November 13, 2017 and has filed this case within 90

days of same.

## COUNT 1

**Quid Pro Quo Sexual Harassment**
**In Violation of Title VII of the Civil Rights Act of 1964**
**42 U.S.C. § 2000(e)-2(a)(1)**
**(As to Optimum and Owens)**

39)   The Plaintiff re-alleges the preceding paragraphs as if fully set forth in this count.

40)   The Plaintiff, as a woman, is a member of a protected group.  She needed her job at Optimum Labs to pay her bills and take care of her family.

41)   The defendant, Owens is the CEO of Optimum and a Director of the company.

42)   The defendant Optimum Labs is vicariously liable for the acts of Owens as an owner, as CEO, and/or as a superior to the plaintiff.

43)   The defendant, Owens used his position of power over the plaintiff to commit the above described incidents of sexual harassment and disparate treatment.  The Plaintiff did not welcome or consent to said acts and treatment.

44)   The Plaintiff rejected and attempted to reject the harassment of Owens and complained to Optimum about Owens's treatment of her.

45)   The direct sexual harassment by Owen, described above, occurred at Optimum Labs and in some instances away from Optimum Labs.

46)   Owens, directly and/or indirectly indicated and/or inferred that the plaintiff would get preferential treatment at work or would retain her job if she engaged in a romantic and/or sexual relationship with Owens.  Owens invited the plaintiff to his home, to use his pool, to take Ambien, go on vacation, offered to take her shopping to Victoria's Secrets, used pet names for her and repeatedly called her into his office to see her "pretty face."

47)   In addition, Owens referred to the plaintiff's children as his stepchildren, stated in front of co-workers that the plaintiff needed a man that owned his own business and said she was "his future."

48)   Owens' repeated pursuit of the plaintiff, resulted in rumors and scrutiny by managers and co-workers that the plaintiff was engaged in a sexual relationship with Owens which affected her ability to perform her job along and her reputation at work.

49)   After resisting Owens' requests, the plaintiff complained to her supervisor after which she was suspended, with Optimum offering a pre-text of policy violations as the reason for her termination.

50)   Within days of her suspension, Owens requested to meet with the plaintiff near her home. He fired the plaintiff and then stated to her, "You know, if you were fucking the boss you wouldn't have to worry about losing your job because I would have to keep you by my side because I run shit."  The plaintiff replied that she could not believe that Owens had just said that. Owens laughed then asked the plaintiff if she needed anything, to which she replied "No." Owens then suggested to the plaintiff that now that she had lost her job, he could re-hire her to go on the road with him.

51)   Owens' statements and actions revealed his true intentions and motives which were for the plaintiff to agree to his sexual advances or else be terminated.  He even tried to re-hire her on the condition that she be his business traveling companion, inferring that she have a sexual relationship with him on business trips.

52)   Moreover, Owens' acts of harassment caused emotional distress and led to the Plaintiff's wrongful termination from Optimum Labs.

53)   The defendant, Optimum Labs, is vicariously liable for the actions of its CEO, Owens. Optimum Labs was aware of the conduct, failed to take reasonable steps to stop the conduct and/or or to enact and/or enforce policies and procedures to prevent Owens from continuing to harass the plaintiff.

WHEREFORE, the Plaintiff requests judgment in her favor on this Count and further requests that this Court award her actual damages in an amount to be proven at trial, punitive and/or multiple damages to the extent allowed by the applicable law, attorney's fees and costs, pre-and post-judgment interest on any award, and any other relief that the Court deems just and proper.

### COUNT 2

**Hostile Work Environment Sexual Harassment**
**In Violation of Title VII of the Civil Rights Act of 1964**
**42 U.S.C. § 2000(e)-2(a)(1)**
**(As to Optimum, Owens and Johnson)**

54) The Plaintiff re-alleges the preceding paragraphs as if fully set forth in this count.

55) The Plaintiff, as a woman, is a member of a protected group.

56) In addition to the direct sexual harassment described above, a hostile work environment based on sexual harassment existed at Optimum Labs.

57) On numerous occasions, Johnson made lewd and inappropriate comments to female employees. Moreover, Johnson was known to have had a relationship with a female employee who had received promotions after the start of their relationship. Johnson had a reputation at Optimum Labs for directly and indirectly harassing the female employees.

58) The plaintiff heard Johnson make such comments including, to another female employee "Do you know whose fucking house this is? Who the fuck do you think you are acting a fool in my fucking house".  He also made sexualized statements to women about hose they looked, commenting about clothing. He would quote lyrics to songs which demeaned women. She also observed Johnson repeatedly harass and berate other women employees.

59)   Despite complaints of sexual harassment to management, as well as Johnson's direct involvement in the alleged sexual harassment, Optimum Labs took no steps whatsoever to stop Johnson or change the hostile work environment at Optimum Labs.

60)   The hostile environment created by Johnson was allowed to continue because he was the *de facto* owner of Optimum Labs, had supervisory authority and also had the power to hire and fire employees.

61)   In addition, the defendant, Owens used his position of power over the plaintiff to commit the above described incidents of sexual harassment and disparate treatment.  The Plaintiff did not welcome or consent to said acts and treatment.

62)   The Plaintiff rejected and attempted to reject the harassment of Owens and complained to Optimum about Owens's treatment of her.

63)   The direct sexual harassment by Owen, described above, occurred at Optimum Labs and in some instances away from Optimum Labs.

64)   Owens, directly and/or indirectly indicated and/or inferred that the plaintiff would get preferential treatment at work or would retain her job if she engaged in a romantic and/or sexual relationship with Owens.  Owens invited the plaintiff to his home, to use his pool, to take Ambien, go on vacation, offered to take her shopping to Victoria's Secrets, used pet names for her and repeatedly called her into his office to see her "pretty face."

65)   In addition, Owens referred to the plaintiff's children as his stepchildren, stated in front of co-workers that the plaintiff needed a man that owned his own business and said she was "his future."

66)   Owens' repeated pursuit of the plaintiff resulted in rumors and scrutiny by managers and co-workers that the plaintiff was engaged in a sexual relationship with Owens which affected her ability to perform her job along and her reputation at work.

67)   After resisting Owens' requests, the plaintiff complained to her supervisor after which she was suspended, with Optimum offering a pre-text of policy violations as the reason for her termination.

68)   Within days of her suspension, Owens requested to meet with the plaintiff near her home. He fired the plaintiff and then stated to her, "You know, if you were fucking the boss you wouldn't have to worry about losing your job because I would have to keep you by my side because I run shit."  The plaintiff replied that she could not believe that Owens had just said that. Owens laughed then asked the plaintiff if she needed anything, to which she replied "No." Owens then suggested to the plaintiff that now that she had lost her job, he could re-hire her to go on the road with him.

69)   Owens' statements and actions revealed his true intentions and motives which were for the plaintiff to agree to his sexual advances or else be terminated.  He even tried to re-hire her on the condition that she be his business traveling companion, inferring that she have a sexual relationship with him on business trips.

70)   Optimum Labs and Johnson had not established a *bonafide* personal director or complaint coordinator to whom woman employees could safely complain about Owens and Johnson.

71)   The defendant, Owens and Johnson carried out these numerous instances of sexual based harassment in their roles as executives at Optimum Labs.

72)   The environment of harassment was sufficiently severe and/or pervasive so as to alter the conditions of the plaintiff's employment and create an abusive work environment.  The hostile

work environment at Optimum Labs was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive.

73)   The above described acts of sexual harassment caused emotional distress and led to the Plaintiff's inability to fully perform her work at Optimum Labs and lead to her termination.

74)   The plaintiff was terminated as a result of her complaints of sexual harassment and the hostile work environment at Optimum Labs.

75)   The Defendant, Optimum Labs, is individually and vicariously liable for the severe and pervasive sexual harassment because the sexual harassment resulted in tangible employment action(s) against the Plaintiff, including but not limited to, her suspension and termination from employment at Optimum Labs.  Optimum Labs had direct knowledge of the harassment, did nothing to prevent and/or correct the sexual harassment, and the Plaintiff acted reasonably within her rights in reporting the sexual harassment and filing this federal lawsuit.

WHEREFORE, the Plaintiff requests judgment in her favor on this Count and further requests that this Court award her actual damages in an amount to be proven at trial, punitive and/or multiple damages to the extent allowed by the applicable law, attorney's fees and costs, pre-and post-judgment interest on any award, and any other relief that the Court deems just and proper.

## COUNT 3

**Gender Based Discrimination**
**In Violation of Title VII of the Civil Rights Act of 1964**
**42 U.S.C. § 2000(e)-2(a)(1)**
**(As to Optimum, Owens and Johnson)**

76)   The Plaintiff re-alleges the preceding paragraphs as if fully set forth in this count.

77)   The sexual harassment of the Plaintiff as alleged constitutes gender based discrimination in itself.

78)   In addition, as also alleged above, the Defendant Johnson treated the Plaintiff and other female employees different than the men.  The Defendants required female employees to conduct mandatory cleaning duties and not the male employees.  The Defendant Johnson, through the use of on-site and off-site video surveillance, would watch the female employees at work and call in to correct their work performance.  Johnson did not do this for the male employees.

79)   Moreover, Johnson berated the plaintiff and other female employees in front of co-workers. He did not treat the male employees in the same manner.

80)   In addition, the defendant, Owens used his position of power over the plaintiff to commit the above described incidents of sexual harassment and disparate treatment.  The Plaintiff did not welcome or consent to said acts and treatment.

81)   Owens and Johnson did not treat the male employees in the same or similar manner.  The sexual harassment and hostile work environment created by the defendants was due to the fact that the plaintiff was a female.

82)   The Plaintiff rejected and attempted to reject the harassment of Owens and complained to Optimum about Owens's treatment of her.

83)   The direct sexual harassment by Owen, described above, occurred at Optimum Labs and in some instances away from Optimum Labs.

84)   Owens, directly and/or indirectly indicated and/or inferred that the plaintiff would get preferential treatment at work or would retain her job if she engaged in a romantic and/or sexual relationship with Owens.  Owens invited the plaintiff to his home, to use his pool, to take Ambien, go on vacation, offered to take her shopping to Victoria's Secrets, used pet names for her and repeatedly called her into his office to see her "pretty face."

85)   In addition, Owens referred to the plaintiff's children as his stepchildren, stated in front of co-workers that the plaintiff needed a man that owned his own business and said she was "his future."

86)   Owens' repeated pursuit of the plaintiff resulted in rumors and scrutiny by managers and co-workers that the plaintiff was engaged in a sexual relationship with Owens which affected her ability to perform her job along and her reputation at work.

87)   After resisting Owens' requests, the plaintiff complained to her supervisor after which she was suspended, with Optimum offering a pre-text of policy violations as the reason for her termination.

88)   Within days of her suspension, Owens requested to meet with the plaintiff near her home. He fired the plaintiff and then stated to her, "You know, if you were fucking the boss you wouldn't have to worry about losing your job because I would have to keep you by my side because I run shit."  The plaintiff replied that she could not believe that Owens had just said that. Owens laughed then asked the plaintiff if she needed anything, to which she replied "No." Owens then suggested to the plaintiff that now that she had lost her job, he could re-hire her to go on the road with him.

89)   Owens' statements and actions revealed his true intentions and motives which were for the plaintiff to agree to his sexual advances or else be terminated.  He even tried to re-hire her on the condition that she be his business traveling companion, inferring that she have a sexual relationship with him on business trips.

90)   The Defendants are individually and vicariously liable for the discriminatory treatment perpetrated on the Plaintiff.  The Defendants discriminatory acts caused the Plaintiff damages,

including but not limited to emotional distress and/or the constructive discharge from employment at Optimum Labs.

WHEREFORE, the Plaintiff requests judgment in her favor on this Count and further requests that this Court award her actual damages in an amount to be proven at trial, punitive and/or multiple damages to the extent allowed by the applicable law, attorney's fees and costs for the civil and criminal cases, pre-and post-judgment interest on any award, and any other relief that the Court deems just and proper.

## COUNT 4
### Sexual Harassment
### In Violation of Mass. G.L. c. 151B § 1, 4(16A)
### (As to Optimum, Owens and Johnson)

91)   The Plaintiff re-alleges the preceding paragraphs as if fully set forth in this count.

92)   The Plaintiff, as a woman, is a member of a protected group.

93)   In addition to the direct sexual harassment described above, a hostile work environment based on sexual harassment existed at Optimum Labs.

94)   On numerous occasions, Johnson made lewd and inappropriate comments to female employees. Moreover, Johnson was known to have had a relationship with a female employee who had received promotions after the start of their relationship.  Johnson had a reputation at Optimum Labs for directly and indirectly harassing the female employees.

95)    She also observed Johnson repeatedly harass and berate other women employees.

96)   Despite complaints of sexual harassment to management, as well as Johnson's direct involvement in the alleged sexual harassment, Optimum Labs took no steps whatsoever to stop Johnson or change the hostile work environment at Optimum Labs.

97)   The hostile environment created by Johnson was allowed to continue because he was the *de facto* owner of Optimum Labs, had supervisory authority and also had the power to hire and fire employees.

98)   In addition, the defendant, Owens used his position of power over the plaintiff to commit the above described incidents of sexual harassment and disparate treatment.  The Plaintiff did not welcome or consent to said acts and treatment.

99)   The Plaintiff rejected and attempted to reject the harassment of Owens and complained to Optimum about Owens's treatment of her.

100)   The direct sexual harassment by Owen, described above, occurred at Optimum Labs and in some instances away from Optimum Labs.

101)   Owens, directly and/or indirectly indicated and/or inferred that the plaintiff would get preferential treatment at work or would retain her job if she engaged in a romantic and/or sexual relationship with Owens.  Owens invited the plaintiff to his home, to use his pool, to take Ambien, go on vacation, offered to take her shopping to Victoria's Secrets, used pet names for her and repeatedly called her into his office to see her "pretty face."

102)   In addition, Owens referred to the plaintiff's children as his stepchildren, stated in front of co-workers that the plaintiff needed a man that owned his own business and said she was "his future."

103)   Owens' repeated pursuit of the plaintiff resulted in rumors and scrutiny by managers and co-workers that the plaintiff was engaged in a sexual relationship with Owens which affected her ability to perform her job along and her reputation at work.

104) After resisting Owens' requests, the plaintiff complained to her supervisor after which she was suspended, with Optimum offering a pre-text of policy violations as the reason for her termination.

105) Within days of her suspension, Owens requested to meet with the plaintiff near her home. He fired the plaintiff and then stated to her, "You know, if you were fucking the boss you wouldn't have to worry about losing your job because I would have to keep you by my side because I run shit." The plaintiff replied that she could not believe that Owens had just said that. Owens laughed then asked the plaintiff if she needed anything, to which she replied "No." Owens then suggested to the plaintiff that now that she had lost her job, he could re-hire her to go on the road with him.

106) Owens' statements and actions revealed his true intentions and motives which were for the plaintiff to agree to his sexual advances or else be terminated. He even tried to re-hire her on the condition that she be his business traveling companion, inferring that she have a sexual relationship with him on business trips. Owens' harassment of the plaintiff constituted *quid pro quo* sexual harassment.

107) Optimum Labs and Johnson had not established a *bonafide* personal director or complaint coordinator to whom woman employees could safely complain about Owens and Johnson.

108) The defendant, Owens and Johnson carried out these numerous instances of sexual based harassment in their roles as executives at Optimum Labs.

109) The environment of harassment was sufficiently severe and/or pervasive so as to alter the conditions of the plaintiff's employment and create an abusive work environment. The hostile work environment at Optimum Labs was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive.

110) The above described acts of sexual harassment caused emotional distress and led to the Plaintiff's inability to fully perform her work at Optimum Labs and lead to her termination.

111) The plaintiff was terminated as a result of her complaints of sexual harassment and the hostile work environment at Optimum Labs.

112) The Defendant, Optimum Labs, is individually and vicariously liable for the severe and pervasive sexual harassment because the sexual harassment resulted in tangible employment action(s) against the Plaintiff, including but not limited to, her suspension and termination from employment at Optimum Labs.  Optimum Labs had direct knowledge of the harassment, did nothing to prevent and/or correct the sexual harassment, and the Plaintiff acted reasonably within her rights in reporting the sexual harassment and filing this federal lawsuit.

WHEREFORE, the Plaintiff requests judgment in her favor on this Count and further requests that this Court award her actual damages in an amount to be proven at trial, punitive and/or multiple damages to the extent allowed by the applicable law, attorney's fees and costs, pre-and post-judgment interest on any award, and any other relief that the Court deems just and proper.

## COUNT 5

### Hostile Work Environment Sexual Harassment
### In Violation of Mass. G.L. c. 151B § 4(16A)
### (As to Optimum, Owens and Johnson)

113) The Plaintiff re-alleges the preceding paragraphs as if fully set forth in this count.

114) The Plaintiff, as a woman, is a member of a protected group.

115) In addition to the direct sexual harassment described above, a hostile work environment based on sexual harassment existed at Optimum Labs.

116) On numerous occasions, Johnson made lewd and inappropriate comments to female employees. Moreover, Johnson was known to have had a relationship with a female employee who had received promotions after the start of their relationship. Johnson had a reputation at Optimum Labs for directly and indirectly harassing the female employees.

117) She also observed Johnson repeatedly harass and berate other women employees.

118) Despite complaints of sexual harassment to management, as well as Johnson's direct involvement in the alleged sexual harassment, Optimum Labs took no steps whatsoever to stop Johnson or change the hostile work environment at Optimum Labs.

119) The hostile environment created by Johnson was allowed to continue because he was the *de facto* owner of Optimum Labs, had supervisory authority and also had the power to hire and fire employees.

120) In addition, the defendant, Owens used his position of power over the plaintiff to commit the above described incidents of sexual harassment and disparate treatment. The Plaintiff did not welcome or consent to said acts and treatment.

121) The Plaintiff rejected and attempted to reject the harassment of Owens and complained to Optimum about Owens's treatment of her.

122) The direct sexual harassment by Owen, described above, occurred at Optimum Labs and in some instances away from Optimum Labs.

123) Owens, directly and/or indirectly indicated and/or inferred that the plaintiff would get preferential treatment at work or would retain her job if she engaged in a romantic and/or sexual relationship with Owens. Owens invited the plaintiff to his home, to use his pool, to take Ambien, go on vacation, offered to take her shopping to Victoria's Secrets, used pet names for her and repeatedly called her into his office to see her "pretty face."

124) In addition, Owens referred to the plaintiff's children as his stepchildren, stated in front of co-workers that the plaintiff needed a man that owned his own business and said she was "his future."

125) Owens' repeated pursuit of the plaintiff resulted in rumors and scrutiny by managers and co-workers that the plaintiff was engaged in a sexual relationship with Owens which affected her ability to perform her job along and her reputation at work.

126) After resisting Owens' requests, the plaintiff complained to her supervisor after which she was suspended, with Optimum offering a pre-text of policy violations as the reason for her termination.

127) Within days of her suspension, Owens requested to meet with the plaintiff near her home. He fired the plaintiff and then stated to her, "You know, if you were fucking the boss you wouldn't have to worry about losing your job because I would have to keep you by my side because I run shit."  The plaintiff replied that she could not believe that Owens had just said that. Owens laughed then asked the plaintiff if she needed anything, to which she replied "No." Owens then suggested to the plaintiff that now that she had lost her job, he could re-hire her to go on the road with him.

128) Owens' statements and actions revealed his true intentions and motives which were for the plaintiff to agree to his sexual advances or else be terminated.  He even tried to re-hire her on the condition that she be his business traveling companion, inferring that she have a sexual relationship with him on business trips.  Owens' harassment of the plaintiff constituted *quid pro quo* sexual harassment.

129) Optimum Labs and Johnson had not established a *bonafide* personal director or complaint coordinator to whom woman employees could safely complain about Owens and Johnson.

130) The defendant, Owens and Johnson carried out these numerous instances of sexual based harassment in their roles as executives at Optimum Labs.

131) The environment of harassment was sufficiently severe and/or pervasive so as to alter the conditions of the plaintiff's employment and create an abusive work environment.  The hostile work environment at Optimum Labs was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive.

132) The above described acts of sexual harassment caused emotional distress and led to the Plaintiff's inability to fully perform her work at Optimum Labs and lead to her termination.

133) The plaintiff was terminated as a result of her complaints of sexual harassment and the hostile work environment at Optimum Labs.

134) The Defendant, Optimum Labs, is individually and vicariously liable for the severe and pervasive sexual harassment because the sexual harassment resulted in tangible employment action(s) against the Plaintiff, including but not limited to, her suspension and termination from employment at Optimum Labs.  Optimum Labs had direct knowledge of the harassment, did nothing to prevent and/or correct the sexual harassment, and the Plaintiff acted reasonably within her rights in reporting the sexual harassment and filing this federal lawsuit.

WHEREFORE, the Plaintiff requests judgment in her favor on this Count and further requests that this Court award her actual damages in an amount to be proven at trial, punitive and/or multiple damages to the extent allowed by the applicable law, attorney's fees and costs, pre-and post-judgment interest on any award, and any other relief that the Court deems just and proper.

## COUNT 6

**Gender Based Discrimination**
**In Violation of Mass. G.L. c. 151B §§ 4(1); 151B § 1(18)**

**(As to Optimum, Owens and Johnson)**

135) The Plaintiff re-alleges the preceding paragraphs as if fully set forth in this count.

136) The sexual harassment of the Plaintiff as alleged constitutes gender based discrimination in itself.

137) In addition, as also alleged above, the Defendant Johnson treated the Plaintiff and other female employees different than the men.  The Defendants required female employees to conduct mandatory cleaning duties and not the male employees.  The Defendant Johnson, through the use of on-site and off-site video surveillance, would watch the female employees at work and call in to correct their work performance.  Johnson did not do this for the male employees.

138) Moreover, Johnson berated the plaintiff and other female employees in front of co-workers. He did not treat the male employees in the same manner. He was constantly yelling at women. He called group meetings to single out women for criticism and humiliation.

139) In addition, the defendant, Owens used his position of power over the plaintiff to commit the above described incidents of sexual harassment and disparate treatment.  The Plaintiff did not welcome or consent to said acts and treatment.

140) Owens and Johnson did not treat the male employees in the same or similar manner.  The sexual harassment and hostile work environment created by the defendants was due to the fact that the plaintiff was a female.

141) The Plaintiff rejected and attempted to reject the harassment of Owens and complained to Optimum about Owens's treatment of her.

142) The direct sexual harassment by Owen, described above, occurred at Optimum Labs and in some instances away from Optimum Labs.

143) Owens, directly and/or indirectly indicated and/or inferred that the plaintiff would get preferential treatment at work or would retain her job if she engaged in a romantic and/or sexual relationship with Owens.  Owens invited the plaintiff to his home, to use his pool, to take Ambien, go on vacation, offered to take her shopping to Victoria's Secrets, used pet names for her and repeatedly called her into his office to see her "pretty face."

144) In addition, Owens referred to the plaintiff's children as his stepchildren, stated in front of co-workers that the plaintiff needed a man that owned his own business and said she was "his future."

145) Owens' repeated pursuit of the plaintiff resulted in rumors and scrutiny by managers and co-workers that the plaintiff was engaged in a sexual relationship with Owens which affected her ability to perform her job along and her reputation at work.

146) After resisting Owens' requests, the plaintiff complained to her supervisor after which she was suspended, with Optimum offering a pre-text of policy violations as the reason for her termination.

147) Within days of her suspension, Owens requested to meet with the plaintiff near her home. He fired the plaintiff and then stated to her, "You know, if you were fucking the boss you wouldn't have to worry about losing your job because I would have to keep you by my side because I run shit."  The plaintiff replied that she could not believe that Owens had just said that. Owens laughed then asked the plaintiff if she needed anything, to which she replied "No." Owens then suggested to the plaintiff that now that she had lost her job, he could re-hire her to go on the road with him.

148) Owens' statements and actions revealed his true intentions and motives which were for the plaintiff to agree to his sexual advances or else be terminated.  He even tried to re-hire her on the

condition that she be his business traveling companion, inferring that she have a sexual relationship with him on business trips.

149) The Defendants are individually and vicariously liable for the discriminatory treatment perpetrated on the Plaintiff. The Defendants discriminatory acts caused the Plaintiff damages, including but not limited to emotional distress and/or the constructive discharge from employment at Optimum Labs.

WHEREFORE, the Plaintiff requests judgment in her favor on this Count and further requests that this Court award her actual damages in an amount to be proven at trial, punitive and/or multiple damages to the extent allowed by the applicable law, attorney's fees and costs for the civil and criminal cases, pre-and post-judgment interest on any award, and any other relief that the Court deems just and proper.

## COUNT 7

### Aiding and Abetting Discrimination
### In Violation of Mass. G.L. c. 151B §§ 4(5)
### (As to Cabral and Owens)

150) The Plaintiff re-alleges the preceding paragraphs as if fully set forth in this count.

151) The plaintiff complained to her supervisor, the defendant Cabral, about Owens' repeated harassment of her. Instead of investigating the plaintiff's complaint, Cabral legitimized Owens' action by accusing the plaintiff of having a relationship with Owens and spreading false rumors throughout the workplace that the plaintiff was in a relationship with Owens.

152) These false rumors resulted in scrutiny from managers and co-workers and damaged the plaintiff's reputation at work. The plaintiff complained to Owens about these false rumors and, as the CEO of the company, he did nothing to stop the rumors or reprimand Cabral or any other

employee.  Rather, Owens allowed the rumors to persist and continued his harassment of the plaintiff.

153) In addition, after and as a direct result of the plaintiff's complaint to Cabral, Cabral, with the aid of Owens, began to overly scrutinize the plaintiff's work performance.

154) On or about March 1, 2016, Cabral and Owens, along with other management employees, met with the plaintiff.  The plaintiff was suspended.  The pre-text for her suspension were claimed violations of procedure, which the plaintiff challenged the defendants to verify with a client but her requests were not acted on to her knowledge.

155) On March 8, within days of the plaintiff's suspension, Owens requested to meet with the plaintiff near her home.  The plaintiff met with Owens.  Owens informed her that she was fired and stated that it was in part retaliation by Heather Cabral.  He then stated words to the affect: "Heather was being malicious.  Heather believes whatever she believes about out relationship.  Maybe she wants some Billy O."  The plaintiff reminded Owens of her repeated complaints to him about false rumors of a relationship between them.

156) He fired the plaintiff and then stated to her, "You know, if you were fucking the boss you wouldn't have to worry about losing your job because I would have to keep you by my side because I run shit."  The plaintiff replied that she could not believe that Owens had just said that. Owens laughed then asked the plaintiff if she needed anything, to which she replied "No." Owens then suggested to the plaintiff that now that she had lost her job, he could re-hire her to go on the road with him.

157) Owens' statements and actions revealed his true intentions and motives which were for the plaintiff to agree to his sexual advances or else be terminated.  He even tried to re-hire her on the

condition that she be his business traveling companion, inferring that she have a sexual relationship with him on business trips.

158) Owen and Cabral are individually liable for the acts and omission which constituted the aiding and abetting of harassment against the plaintiff.  The defendants conduct caused the Plaintiff damages, including but not limited to emotional distress and her termination from Optimum Labs.

WHEREFORE, the Plaintiff requests judgment in her favor on this Count and further requests that this Court award her actual damages in an amount to be proven at trial, punitive and/or multiple damages to the extent allowed by the applicable law, attorney's fees and costs for the civil and criminal cases, pre-and post-judgment interest on any award, and any other relief that the Court deems just and proper.

### COUNT 8

**Retaliation**
**In Violation of Mass. G.L. c. 151B §§ 4(4), (4A)**
**(As to Cabral and Owens)**

159) The Plaintiff re-alleges the preceding paragraphs as if fully set forth in this count.

160) The plaintiff complained to her supervisor, the defendant Cabral, about Owens' repeated harassment of her.  Instead of investigating the plaintiff's complaint, Cabral legitimized Owens' action by accusing the plaintiff of having a relationship with Owens and spreading false rumors throughout the workplace that the plaintiff was in a relationship with Owens.

161) These false rumors resulted in scrutiny from managers and co-workers and damaged the plaintiff's reputation at work.  The plaintiff complained to Owens about these false rumors and, as the CEO of the company, he did nothing to stop the rumors or reprimand Cabral or any other

employee.  Rather, Owens allowed the rumors to persist and continued his harassment of the plaintiff.

162) In addition, after and as a direct result of the plaintiff's complaint to Cabral, Cabral, with the aid of Owens, began to overly scrutinize the plaintiff's work performance.

163) On or about March 1, 2016, Cabral and Owens, along with other management employees, met with the plaintiff.  The plaintiff was suspended by Optimum.  The pre-text for her suspension were claimed violations of procedure, which the plaintiff challenged the defendants to verify with a client but her requests were not acted on to her knowledge.

164) On March 8, within days of the plaintiff's suspension, Owens requested to meet with the plaintiff near her home.  The plaintiff met with Owens.  Owens informed her that she was fired and stated that it was in part retaliation by Heather Cabral.  He then stated words to the affect: "Heather was being malicious.  Heather believes whatever she believes about out relationship.  Maybe she wants some Billy O."  The plaintiff reminded Owens of her repeated complaints to him about false rumors of a relationship between them.

165) He fired the plaintiff and then stated to her, "You know, if you were fucking the boss you wouldn't have to worry about losing your job because I would have to keep you by my side because I run shit."  The plaintiff replied that she could not believe that Owens had just said that.  Owens laughed then asked the plaintiff if she needed anything, to which she replied "No."  Owens then suggested to the plaintiff that now that she had lost her job, he could re-hire her to go on the road with him.

166) Owens' statements and actions revealed his true intentions and motives which were for the plaintiff to agree to his sexual advances or else be terminated.  He even tried to re-hire her on the

condition that she be his business traveling companion, inferring that she have a sexual relationship with him on business trips.

167) Owen and Cabral are individually liable for the acts and omissions which constituted retaliation against the plaintiff.

168) Optimum Labs is vicariously liable for the acts of Owen and Cabral and directly liable for its own acts and omissions in failing to investigate the plaintiff's complaint, overly scrutinizing the plaintiff's work after her complaint, suspending the plaintiff and then terminating the plaintiff.  The defendants' conduct caused the Plaintiff damages, including but not limited to emotional distress and her termination from Optimum Labs.

WHEREFORE, the Plaintiff requests judgment in her favor on this Count and further requests that this Court award her actual damages in an amount to be proven at trial, punitive and/or multiple damages to the extent allowed by the applicable law, attorney's fees and costs for the civil and criminal cases, pre-and post-judgment interest on any award, and any other relief that the Court deems just and proper.

**<u>PLAINTIFF DEMANDS A JURY TRIAL</u>**

Respectfully submitted
On Behalf of the Plaintiff,

/s/ Christopher Trundy
_____
Christopher C. Trundy
BBO #555622
240 Union St.
P.O. Box 1203
New Bedford, MA 02741
(508) 984-4000 (tel); (508) 999-1670 (fax)
christrundy@trundylaw.com

/s/ Carlin J. Phillips
_____
Carlin J. Phillips
BBO# 561916
PHILLIPS & GARCIA, P.C.
13 Ventura Drive
N. Dartmouth, MA 02747
508-998-0800 (tel); 508-998-0919 (fax)
cphillips@phillipsgarcia.com